**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.**

| | |
|---|---|
| ASHLEY ZAUFLIK, | : No. 1 MAP 2014 |
| | : |
| Appellant | : Appeal from the Order of the |
| | : Commonwealth Court dated July 3, 2013 at |
| | : No. 1219 CD 2012 affirming the order of |
| v. | : the Bucks County Court of Common Pleas, |
| | : Civil Division, dated May 24, 2012, |
| | : Judgment Entered June 7, 2012, at No. |
| PENNSBURY SCHOOL DISTRICT, | : 2007-09693-27-1. |
| | : |
| Appellee | : ARGUED:  May 6, 2014 |

## <u>OPINION</u>

**MR. CHIEF JUSTICE CASTILLE**          **DECIDED:   November 19, 2014**

Appellant Ashley Zauflik sustained severe and permanent injuries, including a crushed pelvis and the amputation of her left leg above the knee, when a school bus owned by, and operated by an employee of, appellee Pennsbury School District ("Pennsbury") accelerated out of control onto a sidewalk and struck twenty students. The issue presented does not concern liability. Rather, the appeal presents a legal challenge to the constitutionality of the $500,000 statutory limit available in tort from a local agency such as Pennsbury. The lower courts, consistently with governing law from this Court, denied the challenges to the damages cap. We are now asked to reconsider our prior decisions, in light of a series of constitutional arguments forwarded by appellant. After due consideration of those claims, we affirm.

## I.    Background

Appellant filed this negligence action against Pennsbury and other defendants; only Pennsbury remained at time of trial, and only Pennsbury is involved in this appeal.[1] In a pretrial stipulation, Pennsbury admitted liability and that its employee bus driver caused the accident.   At the time of the accident, Pennsbury had $11 million in liability and excess insurance coverage.   But, Pennsbury maintained that its liability was limited to $500,000, the statutory limit on damages recoverable against a local government agency under the Tort Claims Act, 42 Pa.C.S. §§ 8501-8564 (the "Act").[2]   Under Section 8501 of the Act, a "local agency" is defined as a government unit other than the Commonwealth government and includes "an intermediate unit" and "municipalities cooperating in the exercise or performance of governmental functions, powers or responsibilities. . . ."   There is no dispute that the definition of "local agency" includes a public school district such as Pennsbury.

Section 8541 of the Act declares generally that "no local agency shall be liable for any damages" for an injury caused by the agency or its employees, but Section 8542 of

---

[1] Appellant received funds from other defendants pursuant to confidential settlement agreements, but those settlements are not at issue in this appeal.

[2] Chapter 85 of Title 42 of the Pennsylvania Statutes is commonly referred to as the Tort Claims Act, but the chapter is actually entitled "Matters Affecting Government Units," and includes subchapter B ("Actions Against Commonwealth Parties" including "sovereign immunity") and subchapter C ("Actions Against Local Parties" including "governmental immunity").   The Act provides, *inter alia*, tort immunity for the Commonwealth and local agencies, with certain enumerated exceptions.   See also 1 Pa.C.S. § 2310 (intent of General Assembly is that Commonwealth, its officials and employees, shall enjoy sovereign immunity and remain immune from suit except where General Assembly specifically waives immunity).

the Act describes exceptions to that immunity under certain circumstances, including liability for damages arising out of the negligent operation of a motor vehicle, which exception applies in this case. 42 Pa.C.S. §§ 8541-42.[3] However, the Act also includes a statutory limitation on the amount of damages recoverable in cases where governmental immunity is waived under Section 8542. This "statutory cap" or "damages cap" is codified at Section 8553 of the Act: "Damages arising from the same cause of

---

[3] Section 8542 provides, in pertinent part:

**Exceptions to governmental immunity**
**(a) Liability imposed.--**A local agency shall be liable for damages on account of an injury to a person or property within the limits set forth in this subchapter if both of the following conditions are satisfied and the injury occurs as a result of one of the acts set forth in subsection (b):

   (1) The damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available a defense under section 8541 (relating to governmental immunity generally) or section 8546 (relating to defense of official immunity); and

   (2) The injury was caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties with respect to one of the categories listed in subsection (b). . . . .

**(b) Acts which may impose liability.--**The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency:

   (1) Vehicle liability.--The operation of any motor vehicle in the possession or control of the local agency. . . .

42 Pa.C.S. § 8542(a), (b)(1).

action or transaction or occurrence or series of causes of action or transactions or occurrences shall not exceed $500,000 in the aggregate." Id. § 8553(b).[4]

Based on this statutory limit on the damages recoverable by appellant in a tort action against Pennsbury, Pennsbury filed a petition to pay the entire $500,000 into court and forego trial, but appellant opposed the request, and the matter proceeded to trial on damages only. Following a four-day trial, the jury returned a verdict against Pennsbury in the amount of $14,036,263.39, which included $338,580 for past medical expenses, $2,597,682 for future medical expenses, and $11.1 million for past and future pain and suffering. Pennsbury filed a post-trial motion to mold the verdict to $500,000, pursuant to the Act's damages cap. In response to Pennsbury's motion, appellant argued that the statutory damages cap is unconstitutional on several grounds, but the trial court, while opining that the circumstances of the case directed "an unfair and unjust result," followed precedent upholding the damages cap as constitutional, molded the verdict, and entered judgment for $502,661.63, which amount included delay damages.

A divided three-judge panel of the Commonwealth Court affirmed. Zauflik v. Pennsbury School Dist., 72 A.3d 773 (Pa. Cmwlth. 2013). In a majority opinion by Judge Cohn Jubelirer, and joined by President Judge Pellegrini, the court rejected all of appellant's constitutional challenges.[5] Based on *stare decisis*, and specifically on this

---

[4] A similar damages cap is included in Section 8528 of the Act with regard to tort claims against the Commonwealth itself: "Damages arising from the same cause of action or transaction or occurrence or series of causes of action or transactions or occurrences shall not exceed $250,000 in favor of any plaintiff or $1,000,000 in the aggregate." 42 Pa.C.S. § 8528(b).

[5] The court observed that the parties did not explicitly engage in an Edmunds analysis, but that this was not a fatal waiver of appellant's state constitutional claims. Zauflik 72 (continued…)

Court's decisions in Carroll v. County of York, 437 A.2d 394 (Pa. 1981), and Smith v. City of Philadelphia, 516 A.2d 306 (Pa. 1986), the court held that the Act's damages cap does not violate the "remedies clause" of Article I, Section 11 of the Pennsylvania Constitution.[6] 72 A.3d at 784-85. The court further held that the statutory cap does not violate Article III, Section 18,[7] relying again on this Court's precedential decision in Smith. Id. at 785. The court also rejected appellant's claims that the damages cap violates the separation of powers by impairing the authority of the Commonwealth's judiciary under Article V, Section 1 of the Constitution, that the cap violates the Article I, Section 6 right to a jury trial by forcing a remittitur of the jury's verdict, and also appellant's arguments that the damages cap violates the equal protection guarantees of the Pennsylvania and U.S. Constitutions. Id. at 785-96. The court explained that, although the "very tragic circumstances of this case weigh heavily. . .[,] as an intermediate appellate court confronting significant and unwavering precedent, our role must be one of restraint. In sum, whether the existence of the excess policy or a different governmental interest could

---

(…continued)
A.3d at 780 n.8 (citing Commonwealth v. Edmunds, 586 A.2d 887, 894 (Pa. 1991) and Commonwealth v. White, 669 A.2d 896, 899 (Pa. 1995)).

[6] Article I, Section 11 provides: "All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct."

[7] Article III, Section 18 provides, in relevant part: "The General Assembly may enact laws requiring the payment by employers, or employers and employes jointly, of reasonable [workers' compensation benefits]; . . . but in no other cases shall the General Assembly limit the amount to be recovered for injuries resulting in death, or for injuries to persons or property. . . . "

be a factor that changes the balance of interests in the constitutional analysis in this case is intriguing, and perhaps appealing, it is not within this Court's purview." Id. at 796. The court concluded that it is the role of the General Assembly "to make the difficult policy decisions and enact them into law if such decisions receive the support of the necessary majority," and thus affirmed the trial court's order molding the jury verdict to reflect the Act's $500,000 damages cap. Id. at 797-98. Senior Judge Friedman filed a dissenting opinion on the basis that, in her view, the damages cap violates appellant's constitutional right to a jury trial. Id. at 798-99. Appellant filed a petition for allowance of appeal.

## II. Issues on Appeal

This Court granted allocatur on the following issues as framed by appellant:

(1) Does the Act's liability cap violate equal protection principles in this case where (a) the cap reduced the jury's verdict by over 96% because [appellant] was injured by a local agency [that] operated the school bus; (b) [appellant] would be entitled to recover the jury's full verdict had a private entity instead operated the school bus, as in [sic] commonplace among school districts; and (c) as this Court held forty years ago, political subdivision immunity is "an anachronism, without rational basis" because local agencies may purchase liability insurance and tort liability promotes accountability and accident-prevention? See Ayala v. Philadelphia Board of Public Educ., 453 Pa. 584, 305 A.2d 877, 881–83 (1973).

(2) Does the Act's liability cap violate equal protection principles in this case where (a) Pennsbury purchased $11 million in insurance, funded by taxpayers, including [appellant's] parents; (b) [appellant] could recover her judgment at least to the extent of the available insurance; and (c) the Commonwealth Court's majority opinion acknowledged that the available insurance presented "intriguing, and perhaps appealing" issues regarding the Act's constitutionality?

(3) Does the liability cap violate [appellant's] right to jury trial guaranteed by Article I, Section 6 of the Pennsylvania constitution where Pennsbury did

not challenge the verdict's excessiveness yet the liability cap eviscerated the verdict by reducing [appellant's] recovery by over 96%?

(4) Does the liability cap impermissibly infringe on the judicial power set forth in Article V, Section 1 of the Pennsylvania constitution by forcing a more than 96% remittitur of the jury's verdict in this case, and thereby usurping the judiciary's exclusive and inherent power to determine remittitur requests?

(5) Does the liability cap violate the open courts provision of Article I, Section 11 of the Pennsylvania constitution by forcing a more than 96% remittitur of the jury's verdict and therefore denying [appellant] full redress of her injuries?

(6) Does the liability cap violate the guarantee against liability limitations set forth in Article III, Section 18 of the Pennsylvania constitution, where this is not a workers' compensation matter?

Zauflik v. Pennsbury School Dist., 84 A.3d 293 (Pa. 2014) (*per curiam*). In her brief to this Court, appellant has argued her issues in a slightly different sequence and our discussion *infra* will follow the order utilized in appellant's brief.

Preliminarily, we recognize that "acts passed by the General Assembly are strongly presumed to be constitutional" and that we will not declare a statute unconstitutional "unless it clearly, palpably, and plainly violates the Constitution. If there is any doubt that a challenger has failed to reach this high burden, then that doubt must be resolved in favor of finding the statute constitutional." Pa. State Ass'n of Jury Comm'rs v. Commonwealth, 64 A.3d 611, 618 (Pa. 2013) (internal citations and quotation marks omitted). See also Commonwealth v. Mockaitis, 834 A.2d 488, 497 (Pa. 2003) (lawfully enacted legislation enjoys a presumption of constitutionality); James v. Southeastern Pa. Trans. Auth., 477 A.2d 1302, 1304 (Pa. 1984) (presumption of constitutionality attached to lawfully enacted legislation; challenger must meet burden of rebutting presumption of constitutionality by clear, palpable, and plain demonstration that statute violates constitutional provision). Courts endeavor to give statutes a constitutional interpretation

if that is reasonably possible.  Bricklayers of Western Pa. Combined Funds, Inc. v. Scott's Development Co., 90 A.3d 682, 692 (Pa. 2014).

### III. Arguments

Appellant first argues that the statutory damages cap violates equal protection principles under both the Pennsylvania and U.S. Constitutions, because the cap discriminates against tort victims based on whether the tortfeasor is a public or a private entity.  According to appellant, she has been denied the equal protection of the laws under the Fourteenth Amendment, and also the enjoyment of a civil right under Article I, Section 26, simply because she happened to be seriously injured by a public entity; under the damages cap she is entitled only to a fraction of the jury verdict another individual – injured by a private tortfeasor – might recover in its entirety.  Appellant argues that her equal protection rights are further violated because someone injured by a private tortfeasor would be entitled to recover the proceeds of applicable insurance, where she is not so entitled.  Appellant asserts that Pennsbury could easily have contracted with a private school bus company, as many school districts do, because transporting students is not a core activity of education that must be performed by public employees.  Thus, according to appellant, the discrimination here, founded only on the identity of the tortfeasor, is unfair and her right to compensation should instead be equal to that of other tort victims, especially where insurance coverage exists, and where Pennsbury may budget for any premium increases caused by elimination of the damages cap.

Appellant further states that in the 256 years of this Court's history without governmental immunity as provided in the Tort Claims Act, "there is no record evidence that any local agency has been ruined by tort liability," and that, in any event, the risk of

severe financial problems for local agencies arising out of unlimited tort liability is "irrelevant" to the question of governmental immunity. Appellant's Brief at 31 (citing Ayala, 305 A.2d at 883 (discussing common law immunity established by decisional law)). This is particularly true, according to appellant, where there exists insurance coverage, and the fact that insurance proceeds are available to victims of private tortfeasors underlines the improper classification applied to appellant under the damages cap.

Although appellant acknowledges that a plurality of this Court has previously applied intermediate scrutiny to an equal protection challenge to the Tort Claims Act in Smith v. City of Philadelphia, 516 A.2d at 311, she argues that we should reconsider that approach and conclude that strict scrutiny is the correct level of examination. This is so, appellant asserts, because the right to obtain full recovery in tort is a fundamental right guaranteed by multiple provisions of the Pennsylvania Constitution, including Article I, Section 6 (right to jury trial) and Section 11 (right to open courts and full remedy). But, appellant states that no matter what level of scrutiny this Court applies -- strict, intermediate or rational basis review -- the damages cap fails to pass constitutional muster.

Appellant further argues that the liability cap violates Article III, Section 18 of the Pennsylvania Constitution, because the General Assembly has improperly limited the amount to be recovered for personal injuries, contrary to that provision's plain language. Section 18 provides that, in no case other than workers' compensation cases, "shall the General Assembly limit the amount to be recovered for injuries resulting in death, or for injuries to persons. . . ." PA. CONST. art. III, § 18. Appellant suggests that the framers could have drafted a more limited prohibition against caps on recovery; if they had intended only to bar caps favoring private parties, for example, they might have written "[other than in workmen's compensation case], in no other cases **against private parties**

shall the General Assembly limit the amount to be recovered." Appellant's Brief at 38. Appellant also cites Robinson Twp. v. Commonwealth, 83 A.3d 901 (Pa. 2013), for the proposition that the plain language of Section 18 directs invalidation of the damages cap, just as a plain language reading of Article I, Section 27, the Environmental Rights Amendment, supported the invalidation of certain provisions of the Oil and Gas Act at issue in Robinson.

According to appellant, the damages cap also violates Article I, Section 11 of the Pennsylvania Constitution, which guarantees "open courts" and provides that individuals "shall have remedy by due course of law, and right and justice administered without sale, denial or delay" for injuries suffered. PA. CONST. art. I, § 11. Appellant notes that Section 11 is included in Article I, the constitutional Declaration of Rights which generally limits the power of state government to restrict rights reserved to the people, and this confirms "that the open courts provision represents a specific reservation of individual rights at government's expense." Appellant's Brief at 43 (citing Robinson Twp., 83 A.3d at 947-48). Appellant argues that Section 11 recognizes a fundamental right, or at least an important one, and therefore heightened scrutiny should apply to the analysis of this claim. See James v. SEPTA, 477 A.2d at 1305-06 (intermediate scrutiny applies to claim that notice provision for suits against government unit violated equal protection principles); Kelly v. Brenner, 175 A. 845, 847 (Pa. 1934) (Section 11 right to open courts is fundamental right). Appellant concedes that the second sentence of Section 11 allows the General Assembly to direct how, where and when "the Commonwealth" may be sued, but she argues that local agencies such as a school district are not "the Commonwealth," see 42 Pa.C.S. § 102 (term "Commonwealth" does not include any political subdivision, municipal or other local authority), and Section 11 therefore does not authorize the

General Assembly to create any limit on the remedies that may be sought against an entity like Pennsbury.

Appellant also claims that the damages cap violates the separation of powers doctrine, in that the Pennsylvania Constitution vests judicial power in the Unified Judicial System only, and that, as a result, only the judiciary may remit excessive verdicts based on the evidence presented at trial. Appellant argues that, in enacting Section 8553, the General Assembly usurped this exclusively judicial power by imposing a "statutory remittitur" on grounds wholly unrelated to the evidence, but rather dependent solely on the identity of the tortfeasor.

Appellant also argues that the damages cap violates her right to a jury trial set forth in Article I, Section 6 of the Pennsylvania Constitution, by "eviscerating the jury's decision," despite the fact that Pennsbury never argued that the verdict was excessive. Appellant claims that her right to a jury trial was rendered meaningless where the liability cap operated to impose a 96% reduction in the award returned by the jury after her trial. According to appellant, the cap improperly burdens her right to a jury trial because the restriction makes the right "practically unavailable." Appellant's Brief at 55 (quoting Application of Smith, 112 A.2d 625, 629 (Pa. 1955)).

Finally, appellant relies on the doctrine of *stare decisis* to argue that Ayala should govern here. Appellant reviews the history of governmental immunity as it arose in Pennsylvania decisional law, and argues that the Ayala Court correctly abolished such immunity in a case with similar facts to those now before the Court, involving serious injury to a public school student, on the basis that "the rule of governmental immunity for tort is an anachronism, without rational basis, and has existed only by the force of inertia." 305 A.2d at 883. Appellant argues that respect for *stare decisis* directs that Ayala be followed here. Although Ayala's abrogation of judicially-created immunity was

undermined by the enactment in 1978 of the Act, and its revision in 1980 to include the damages cap at issue in this appeal, appellant nevertheless argues that the statutory cap should be struck down because Ayala's reasoning is no less persuasive in the face of a legislatively-conferred partial immunity. Thus, according to appellant, Ayala is still entitled to deference, especially "against a stark backdrop of catastrophic injury caused by a defendant's admitted negligence." Appellant's Brief at 23. Appellant argues that Ayala should apply at least to the extent necessary to allow appellant to recover the $11 million liability limit in insurance coverage voluntarily purchased by Pennsbury, and further that immunity should not apply at all where local agencies are free to purchase insurance or insure themselves. In appellant's view, unlimited tort liability against governmental agencies promotes accountability and accident-prevention.

The Pennsylvania Association for Justice ("PAJ") and the American Association for Justice ("AAJ") each filed an *amicus* brief in support of appellant. The PAJ echoes appellant's reliance upon Ayala for the proposition that governmental immunity has no rational basis. The PAJ also asserts that a local government unit is a better loss-distributing agency than innocent injured victims, and complains that the General Assembly enacted the statutory cap in spite of this Court's guidance in Ayala. According to the PAJ, the Court in Smith supposedly ignored its own precedent and *stare decisis* in favor of a presumption of constitutionality. The PAJ then argues that the statutory classification at issue here is based on the arbitrary status of the defendant as a public or a private entity. Separately, the PAJ points out that the amount of the damages cap has not been increased in thirty-six years, although the cost of living has tripled since then, and that, in any event, Pennsbury should be deemed to have affirmatively waived application of the cap when it purchased insurance. The AAJ argues that governmental immunity has no constitutional status; rather, immunity once existed as a matter of the

common law, arising from judicial decisions, but it is now found in legislation that must conform to constitutional limitations. According to the AAJ, the classification based on whether the tortfeasor is a public or private entity is irrational; in AAJ's view, where a public school district is an employer competing in a commercial industry, nothing distinguishes it from a private employer in terms of responsibility for an employee's negligence. Moreover, argues the AAJ, endangerment of the public fisc does not justify the classification.

In response to the arguments of appellant and her *amici,* Pennsbury asserts that the Act's statutory damages cap has already been upheld against constitutional challenge, and that none of the theories of challenge presented in this appeal warrants a different result. Pennsbury relies on Smith, 516 A.2d 306, which involved a gas explosion in Philadelphia that killed seven, injured many others, and caused extensive property damage. Seventy-two plaintiffs sued the City of Philadelphia and other municipal entities in Smith, and the trial court held that the Section 8553(b) damages cap was unconstitutional. However, on direct review, this Court reversed and upheld the cap, ruling that Article I, Section 11 of the Pennsylvania Constitution grants the General Assembly the authority to regulate the manner in which the Commonwealth and its political subdivisions may be sued. Id. at 308-09. Pennsbury also cites the 1981 decision in Carroll, 437 A.2d 394, the first decision from this Court to uphold the cap against constitutional challenge, and many other Commonwealth Court cases decided since then. Pennsbury's Brief at 15 n.10. Pennsbury asserts that no Pennsylvania appellate court has ever reached a conflicting decision in the decades since Carroll, and that legislatively-conferred partial governmental immunity in general has long been the rule in this Commonwealth, notwithstanding the holding in Ayala abrogating common law immunity.

Pennsbury argues that applying the principles of *stare decisis* to reject appellant's challenge here will promote the stability and predictability of the law necessary for political subdivisions to operate within real fiscal constraints and still provide important public services. Pennsbury insists that it is the General Assembly that has the resources and authority to debate about and then fashion appropriate legislation to correct any perceived flaw in the statutory framework, because the issues in this case essentially raise policy questions rather than questions properly resolvable in the adversarial judicial system. According to Pennsbury, courts across the country, with rare exception, have rejected federal and state constitutional challenges to statutes limiting the amount recoverable in tort against states and their subdivisions. See Pennsbury's Brief at 29 n.22 (citing cases).

As to appellant's specific constitutional challenges, Pennsbury argues that the law is clear that every claim fails. First, Pennsbury points out that appellant's claim that the damages cap denies her right to equal protection, as compared to the victim of a private tortfeasor, was raised and rejected in Smith. 516 A.2d at 310. Pennsbury states that the Smith Court applied intermediate scrutiny to the statutory cap to analyze whether an important government interest – preservation of the public treasury against the possibility of large recoveries in tort cases – was closely related to the classification established by the statutory scheme, and determined that it was so related. Id. at 311. Moreover, argues Pennsbury, this Court is not the appropriate forum to address appellant's policy arguments regarding the consequences of a damages cap, such as the culture of complacency or lack of accountability on the part of local agencies that appellant alleges is engendered by the cap, or whether busing students to school ought to be protected as a core function of a public school district; such policy issues are better left to the Legislature, according to Pennsbury.

Also, Pennsbury argues that, in enacting the statutory cap, the General Assembly considered the fact that such a limitation actually enables public entities to assess and manage their risks, which in turn allows local agencies to budget for and provide the core services for all citizens that they are expected to provide.  See Carroll, 437 A.2d at 397. Pennsbury further argues that its purchase of insurance to protect against liabilities **not** subject to the Act and its damages cap does not affect the analysis of whether the cap passes constitutional muster.  For example, the Act's statutory cap does not apply to liability for violations of federal law, or liability for zoning or eminent domain challenges. See Dunaj v. Selective Ins. Co., 647 A.2d 633, 635 n.3 (Pa. Cmwlth. 1994).  Pennsbury asserts that the availability of insurance coverage is almost always irrelevant as a matter of law in a tort action, and appellant's arguments on this point should likewise be rejected. The availability of insurance coverage has nothing to do with the propriety of a statutory classification under an equal protection analysis, according to Pennsbury.  Pennsbury argues that the law is clear that the Act "in no manner evinces a legislative intent to waive the damages limitation upon purchase of liability insurance by a local agency."  Spisak v Downey, 618 A.2d 1174, 1175 n.1 (Pa. Cmwlth. 1992).  And, Pennsbury points out, prior to the "abolition" of common law immunity in Ayala, which led to a void later addressed by enactment of the Act, this Court specifically rejected an argument that a school district's purchase of liability insurance constituted a waiver of governmental immunity.  Supler v. School Dist. of N. Franklin Twp., 182 A.2d 535, 537 (Pa. 1962).

Next, Pennsbury argues that the Act's damages cap does not violate the "anti-cap" provision of Article III, Section 18, and cites to Smith, which specifically considered and rejected this claim.  According to Pennsbury, the Smith Court, in considering the history of Section 18, determined that its anti-cap language applies only to cases involving private defendants, because common law immunity already protected public tortfeasors

at the time the provision was adopted, and "the Framers would have had no reason to concern themselves with governmental liability in tort. . . ." 516 A.2d at 309-10. In particular, Pennsbury notes, school districts historically had been entirely immune from suit. See Ford v. School Dist. of Kendall Borough, 15 A. 812 (Pa. 1888).

According to Pennsbury, neither does the statutory damages cap violate Article I, Section 11, which guarantees that "courts shall be open" and remedies be available for injuries. PA. CONST. art. I, § 11. Pennsbury focuses on the second sentence of Section 11 itself, which expressly authorizes the General Assembly to direct how and where lawsuits may be brought against the Commonwealth, and notes that the Commonwealth has been held to include political subdivisions such as a school district. See Carroll, 437 A.2d at 396. See also Smith, 516 A.2d at 309. Nor does the damages cap violate the separation of powers doctrine, according to Pennsbury, because there can be no such violation if the Legislature has the power to enact the subject limitation. In this case, Article I, Section 11 clearly vests in the General Assembly the power to direct how suits may be brought against the Commonwealth, and the Act's damages cap is one way in which the General Assembly has utilized that power. Finally, Pennsbury argues that the damages cap does not violate appellant's right to a jury trial. Pennsbury notes there is no unfettered right to a jury trial in any event, but appellant's argument is particularly meritless because appellant actually proceeded to a full jury trial in this case.

No fewer than ten *amicus curiae* briefs were filed on behalf of Pennsbury, by twenty-eight different local government entities, political subdivisions, and organizations; unsurprisingly, all discuss the negative financial ramifications of the limitless tort liability that would follow from acceptance of appellant's position. First, the Commonwealth of Pennsylvania reiterates Pennsbury's position that this Court has repeatedly held that the General Assembly is authorized to assert or waive immunity as it sees fit, and to impose

damages caps for cases in which it waives immunity; according to the Commonwealth, appellant has offered no principled basis for reexamination of those decisions. The Commonwealth argues that it is untenable to claim that legislation expressly authorized by the Constitution – pursuant to Article I, Section 11 – violates that same Constitution. With regard to appellant's equal protection claim, the Commonwealth notes that the classification about which appellant complains was created by the Constitution itself, and this Court need not even reach the question of the proper scope of review. But, the Commonwealth notes that federal courts have analyzed immunity provisions under a rational basis paradigm. See Miller v. U.S., 73 F.3d 878 (9th Cir. 1995) (no fundamental right to bring suit against government employee). The Commonwealth also notes that appellant's reliance on Ayala is misplaced because that case did not involve an equal protection challenge; the question there was only whether a judicially-created common law immunity should be abandoned. Respecting appellant's argument regarding the right to a jury trial, the Commonwealth notes that, because Section 11 allows the General Assembly to direct the procedure for resolving suits against the Commonwealth, and – in theory – the General Assembly could thus eliminate jury trials in this area altogether, the less drastic damages cap is certainly constitutional. Finally, the Commonwealth notes that the cap is a legislative device and not a remittitur, so there is no separation of powers problem.

The City of Philadelphia, the City of Pittsburgh and Allegheny County argue on behalf of Pennsbury that the $500,000 cap is essential to their operation as municipalities. These local governments advise that they are self-insured because of the prohibitive cost of – and their inability to procure – other insurance. Elimination of the cap would increase their exposure to risk and stretch already limited resources, as well as create more barriers to providing necessary services to their citizens.

The Pennsylvania County Commissioners, Pennsylvania Chamber of Business and Industry, Pennsylvania Municipal Authorities Association, Pennsylvania Municipal League, Pennsylvania School Boards Association, Pennsylvania State Association of Boroughs, Pennsylvania State Association of Township Commissioners, and the Pennsylvania State Association of Township Supervisors argue that for more than twenty-five years now, local government has relied on the Act's cap to protect their taxpayers and allow them to provide essential government services to the public. Uncapped tort liability would impose significant financial burdens on these entities. Similarly, the Pennsylvania Public Transportation Association, SEPTA, the Port Authority of Allegheny County, and the Pennsylvania Turnpike Commission oppose uncapped liability for tort verdicts such as appellant's -- the amount of which actually exceeds the total annual revenue for most transit authorities in Pennsylvania. The Crawford Area Transportation Authority & Indiana County Transit Authority also press these arguments and further note that they do not have the power of taxation to make up for losses they would suffer due to uncapped tort liability; even one claim like appellant's would eviscerate their small budgets and end their ability to provide bus service to all citizens in underserved rural areas. The State Association for Transit Insurance argues that the purchase of an insurance policy to protect local governments against claims that are not subject to the damages cap, such as federal civil rights claims, does not and should not constitute a waiver of statutorily-conferred immunity.

The Philadelphia Housing Authority and the Housing Authority Risk Retention Group both argue on behalf of Pennsbury that their ability to provide affordable housing would be jeopardized by uncapped liability. The American Insurance Association, Property Casualty Insurers Association of America, Insurance Federation of Pennsylvania, Pennsylvania Defense Institute, and Philadelphia Association of Defense

Counsel all argue that the amount of insurance obtained by local governments should be irrelevant to a constitutional analysis of the damages cap. Similarly, the Delaware Valley Insurance Trust and Pennsylvania Intergovernmental Risk Management Association argue that discarding the Act's cap would jeopardize the availability of insurance coverage for claims not covered by the Act, and that the General Assembly is best suited to address the viability of the cap as a matter of public policy.

Appellant filed a brief in reply to Pennsbury's arguments and those of the Pennsbury *amici*. Appellant challenges, *inter alia*, Pennsbury's recitation of the common law history of governmental immunity in Pennsylvania, stating that immunity was never the rule but rather applied on a case-by-case basis, and that there was never a cap on recovery of damages against a municipality until 1978 with the adoption of the Act. Appellant also rejects Pennsbury's argument that the judiciary may not make policy decisions regarding the statutory damages cap; she argues that it is the province of this Court to determine whether the cap is constitutional or not. Appellant further argues that Pennsbury incorrectly asserts that local agencies are the same as the Commonwealth for purposes of Section 11-based legislative authority to direct the manner in which suits may be brought. Appellant also posits that other states' case law on the subject is not controlling here, where Pennsylvania's unique constitutional provisions are at issue.

Respecting the arguments posed by Pennsbury's *amici*, appellant first urges that this Court should not allow their sheer numbers "to swamp its constitutional reasoning." Reply Brief at 6. Appellant argues that even if the elimination of the damages cap would present financial challenges to local agencies, the Constitution should nevertheless direct the proper result. Appellant further states that much of the discussion by *amici* regarding the budgetary burdens of local agencies is not based on evidence of record, and should not provide grounds for this Court's decision. Finally, with regard to the General

Assembly's authority to consider public policy and draft legislation, appellant argues that a judicial decision to strike down the damages cap would present an opportunity for new and improved legislation, including provisions to assist local agencies with purchasing insurance or pooling their risks. Appellant argues that the current statute should not be permitted to stand and prevent her from achieving a full recovery for her serious injuries.

## IV. Discussion

## A. Historical Context

Although appellant provides an alternative argument that is slightly more modest (*i.e.*, that she should at least be permitted access to Pennsbury's $11 million excess insurance policy coverage), her most basic and recurring theme is that governmental entities like Pennsbury should not enjoy any immunity from tort liability. The underpinning of appellant's overriding absolutist refrain is the Court's 1973 decision in Ayala v. Philadelphia Board of Public Education, 305 A.2d 877, which appellant says should control here by virtue of *stare decisis*. Appellant insists that "Ayala is the starting point and compels the striking of the liability cap. Ayala is the case this Court should follow." Appellant's Brief at 58. To better frame and focus appellant's actual, individual constitutional challenges, we begin with a brief examination of common law governmental immunity, which culminated in Ayala, and which provides the backdrop for the partial and capped immunity, legislatively-conferred in the wake of Ayala, that is at issue here.

The parties, and our prior cases, have settled on Russell v. The Men of Devon, 100 Eng. Rep. 359 (1788), as demonstrating the English concept of sovereign immunity, where the court held that there could be no recovery of damages by plaintiffs whose

"waggon" was damaged due to the condition of a bridge which, it was argued, "ought to have been repaired by the county," the "county" in this instance being an unincorporated group of individual inhabitants. Id. at 360. In denying relief, the court expressed the "general principle of law. . . that it is better that an individual should sustain an injury than that the public should suffer an inconvenience. . . . [I]t is better that the plaintiff should be without a remedy. However there is no foundation on which this action can be supported; and if it had been intended, the Legislature would have interfered and given a remedy. . . ." Id. at 362-63. And, as early as Pennsylvania's Constitution of 1790, the Commonwealth government enjoyed complete immunity if it so chose; the Constitution provided that "[s]uits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct," which language remains in Article I, Section 11 of the current Constitution. See THOMAS R. WHITE, COMMENTARIES ON THE CONSTITUTION OF PENNSYLVANIA, 161 (1907). Appellant's position that the general concept of immunity was not imported into Pennsylvania until much later – in 1888, in Ford v. School District, 15 A. 812 – is belied by this constitutional language. See also Biello v. Pa. Liquor Control Bd., 301 A.2d 849, 850 (Pa. 1973) (doctrine of sovereign immunity arrived in Pennsylvania in Respublica v. Sparhawk, 1 Dall. 357, 1 L.Ed. 174 (1788), in which Court denied recovery to plaintiff seeking value of flour relocated by Commonwealth War Board pursuant to statute intended to prevent British capture of supplies, stating "it is better to suffer a private mischief, than public inconvenience").

It is true that some early court decisions in Pennsylvania allowed tort recovery against government entities under certain circumstances. See, e.g., Dean v. New Milford Twp., 1843 WL 5096 (Pa. 1843) (incorporated township which could lay tax to furnish means for building roads and highways liable for negligence in maintaining and repairing those roads). But, others did not. See, e.g., Mayor v. Randolph, 1842 WL

4889 (Pa. 1842) (City had authority to stop up creek which resulted in flood to plaintiff's land; plaintiff could not challenge manner or purpose of action); <u>Green v. Borough of Reading</u>, 1840 WL 3772 (Pa. 1840) (plaintiff could not recover from borough for damage caused to his property by borough roadwork).  And, by the time <u>Ford</u> was decided in 1888, the rule of governmental immunity prevailed in that case of a public school student who was severely injured as the result of a school district employee's negligence.   15 A. 812.   The <u>Ford</u> Court noted the distinction between public and private actors, and added that "the least stringency should be applied to school-districts, which are established for the administration of what may be regarded as a great public charity."   <u>Id.</u> at 815.   Under this common law regime of governmental immunity, plaintiffs were afforded no money damages in tort actions at all, even despite clear negligence by the public tortfeasor. <u>See</u>, <u>e.g.</u>, <u>Kesman v. Sch. Dist. of Fallowfield Twp.</u>, 29 A.2d 17 (Pa. 1942) (school district not liable for injury to student caused by school bus driver's negligence; collecting cases); <u>Devlin v. Sch. Dist. of Phila.</u>, 10 A.2d 408, 410 (Pa. 1940) (school district is state agency performing governmental functions and is not liable for negligence by its servants who act within scope of these functions).

Decisions in this Court in the mid- to later 20th century betrayed an increasing judicial unease with this doctrine of complete governmental immunity, and the Court began to chip away at that immunity, articulating a variety of rationales.   <u>See</u>, <u>e.g.</u>, <u>Morris v. Sch. Dist. of Twp. of Mt. Lebanon</u>, 144 A.2d 737 (Pa. 1958) (plaintiffs could recover in tort action against school district for death of child who drowned during summer camp; camp activities were proprietary function of type regularly conducted by private enterprises, and district charged fee for participation).   <u>See also</u> <u>Flinchbaugh v. Spera Const. Co.</u>, 264 A.2d 708, 709 (Pa. 1970) (*per curiam*) (Roberts, J., dissenting) (positing that plaintiff was injured when school district was performing proprietary function and thus

should be allowed to recover damages; adding that doctrine of governmental immunity should simply be discarded). On multiple occasions, the Court also appealed to the General Assembly to consider the immunity issue. See, e.g., Dillon v. York City Sch. Dist., 220 A.2d 896, 898 (Pa. 1966) ("Only the legislature can deal with the field of immunity in all of its state, municipal corporations and school district aspects by enacting a comprehensive bill based on extensive hearings and investigation. On the other hand, we continue to be confronted with the problem on the most fragmented basis."); Supler v. Sch. Dist., 182 A.2d at 537 (school district is immune from suit for damages caused by employee's negligence; change in immunity rule "should be made by the Legislature and not by the Courts"); Morris, 144 A.2d at 738 (legislation is "sorely needed to deal effectively with tort claims arising out of the conduct of governmental activities"). See also Brown v. Commonwealth, 305 A.2d 868, 870 & n.6 (Pa. 1973) ("[I]t falls to the Legislature to determine the circumstances under which immunity may be waived. . . . We reiterate our urging of the need for comprehensive legislative action permissible under Article I, Section 11."). This unease with complete governmental immunity was felt across the nation. See, e.g., Ayala, 305 A.2d at 878-79 (collecting cases from other jurisdictions which had judicially abandoned doctrine of governmental immunity). However, in this Commonwealth, the General Assembly had failed to act, and the matter came to a head in Ayala, which expressly overruled earlier cases in which the Court had declined to judicially abrogate the doctrine. Id. at 878 n.3. Indeed, by that time, the Court's familiarity with the difficulties posed by common law immunity was such that Justice Roberts's majority opinion in Ayala began by simply declaring that the doctrine was "long since devoid of any valid justification." Id. at 878.

The underlying facts in Ayala are similar to those presented here, although the decision was obviously powered by the growing unease with the legal doctrine, not the

particular facts. A 15-year-old student's arm was caught in a shredding machine during a class in a Philadelphia school, and as a result of his serious injuries, his arm was amputated. The student and his parents sued the school district for negligence, and the Philadelphia Board of Public Education filed preliminary objections asserting the defense of governmental immunity. 305 A.2d at 878. The preliminary objections were sustained, the case dismissed, and the Pennsylvania Superior Court affirmed in a *per curiam* order, with three judges in concurrence noting their discontent with the doctrine, but recognizing that only the Supreme Court could abrogate it.

The Supreme Court reversed by a 4-3 vote, abolishing outright the doctrine of governmental immunity.[8] The Court first recognized that government agencies like school districts had long been immune from suit at Pennsylvania common law. The Court opined that the historical roots of the doctrine could be traced to English common law, possibly due to English courts' having difficulty with the principle of *respondeat superior*, and also recognized that the concept of immunity was "influenced by the absence of a fund 'out of which satisfaction is to be made'" for the potential flood of actions against political subdivisions if such lawsuits were to be permitted. Id. at 879. The Ayala Court noted that Pennsylvania had "joined the numerous states adopting the immunity doctrine," with the Supreme Court's 1888 decision in Ford v. School District, 15 A. 812, holding that school districts are not liable for the tortious conduct of their employees. 305 A.2d at 880.

> Initially, the [Ford] Court noted that school districts are agents of the Commonwealth "and are made quasi-corporations for the sole purpose of the administration of the commonwealth's system of public education." More importantly, the Court was reluctant to impose liability because "the act of assembly provides no fund out of which the directors can pay

---

[8] Chief Justice Jones and Justices Eagen and O'Brien dissented without opinion. Justice Manderino filed a joining concurrence.

damages resulting from their own misconduct or that of their officers." The Court further stated that "individual advantage must give way to the public welfare."

> Although the English courts abandoned the doctrine and permitted suits against municipalities and school districts, this Commonwealth continued to deny recovery. In Morris v. Mount Lebanon Township School District, 393 Pa. 633, 636, 144 A.2d 737, 738 (1958), the Court refused to completely abrogate the immunity doctrine, but held that school districts, like municipal corporations, "are not immune from liability in tort for the negligent acts of their servants committed in the course of the (school district's) proprietary functions."

Id. at 880-81 (quoting from Ford, supra, citations and footnote omitted). The Ayala Court determined that "no reasons whatsoever exist for continuing to adhere to the doctrine of governmental immunity. Whatever may have been the basis for the inception of the doctrine, it is clear that no public policy considerations presently justify its retention." Id. at 881.

By way of further explanation, the Ayala Court noted the historical change from a "social climate" that had previously protected the rights of the King, to a modern environment which allows the imposition of liability on private corporate entities, even to the extent that liability might be extended without traditional fault, on the grounds that potential personal injury must be calculated as part of the cost of doing business. 305 A.2d at 881-82 (quoting Smith, *Municipal Tort Liability*, 48 MICH. L. REV. 41, 48 (1949)). The Court's decision in Ayala was driven in part by its appreciation that liability follows tortious conduct in private commercial enterprise, and the Court could discern no reason for "permitting governmental units to escape the effect of this fundamental principle." Id. at 882. The Court recognized that, unlike private corporations, governmental entities do not profit from their projects, but countered that "the taxpaying public nevertheless does [profit], and it is the taxpaying public which should pay for governmental maladministration. If the city operates or maintains injury-inducing activities or conditions, the harm thus caused should be viewed as a part of the normal and proper

costs of public administration and not as a diversion of public funds. The city is a far better loss-distributing agency than the innocent and injured victim." Id. (internal quotations omitted).

The Ayala Court, writing in 1973 (and without a trial record that included a $14 million jury verdict in a single case), also rejected the idea that a municipality's potential financial ruin should weigh against abolishing immunity; the Court concluded that the then-existing "empirical data does not support the fear that governmental functions would be curtailed as a result of liability for tortious conduct." Id. at 883. See also Mayle v. Pennsylvania Dept. of Highways, 388 A.2d 709, 714 (Pa. 1978) (no evidence that "tort liability of a government or a public authority has ever resulted in either undue clogging of the courts or destabilization of government finances").

Finally, the Court rejected the argument that abrogation of the doctrine of immunity should only be accomplished by legislation rather than by judicial determination, stressing that the doctrine of immunity was judicially imposed, and so it may be judicially terminated. Ayala, 305 A.2d at 885 (quoting, as direct support, Molitor v. Kaneland Community Unit District No. 302, 163 N.E.2d 89, 96 (Ill. 1959) ("Having found that doctrine to be unsound and unjust under present conditions, we consider that we have not only the power, but the duty, to abolish that immunity. 'We closed our courtroom doors without legislative help, and we can likewise open them.'")). See also Mayle, 388 A.2d at 720 (doctrine of sovereign immunity is manifestly unfair and non-constitutional in origin, and Court may abolish it). In addition, the Court noted that although it had suggested in the past "that the Legislature should undertake the abrogation of judicial immunity," "[t]hese suggestions do not preclude the Court from now abolishing this judicially created doctrine." Ayala, 305 A.2d at 886. The Court thus abrogated the

immunity doctrine, and allowed the Ayalas' negligence lawsuit against the Philadelphia school district to proceed under its "newly adopted rule." Id. at 889.

In 1978, a few months after the Court abolished the related doctrine of sovereign immunity for the Commonwealth in Mayle, the General Assembly responded to the immunity void by enacting the "Political Subdivisions Tort Claims Act," which partially resurrected a form of governmental immunity as a legislative matter. See, e.g., 53 P.S. § 5311.201 ("Except as otherwise provided in this act, no political subdivision shall be liable for any damages on account of any injury to a person or property caused by any act or omission of the political subdivision or an employee thereof or any other person.") (repealed and replaced by Act of October 5, 1980, P.L. 693, No. 142, § 333). Amended in 1980, and entitled "Government immunity generally," current Section 8541 of the Act states: "Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa.C.S. § 8541. Other provisions of the Act specifically limit the circumstances under which local agencies may be held liable for damages in tort. See 42 Pa.C.S. § 8542 (exceptions to governmental immunity). And, also in 1980, the General Assembly further protected government entities from tort liability when it enacted Section 8553(b), the statutory damages cap at issue here, which expressly limits damages in permissible lawsuits to $500,000. Thus, the Act is not so severe as common law immunity, which provided for no recovery; but the recovery is strictly limited. It is clear that the Act is intended to "insulate political subdivisions from tort liability." Mascaro v. Youth Study Center, 523 A.2d 1118, 1123 (Pa. 1987).

Almost immediately, this Court was faced with a constitutional challenge to the Act. In Carroll v. County of York, 437 A.2d 394, plaintiff Carroll's son committed suicide while

in the custody of the York County Detention Home, and Carroll claimed that the negligence of the Home's employees led to his death. After the Home filed preliminary objections based on tort immunity under the newly enacted legislation, Carroll sought plenary review by this Court before the trial court could rule, and we granted review. Id. at 395-96.

Carroll argued that, by prohibiting a tort victim from successfully suing the Commonwealth except under certain enumerated circumstances inapplicable to her case, the Act unconstitutionally "closed" the courts to potential claimants and denied them a "remedy by due course of law" in violation of Article I, Section 11 of the Pennsylvania Constitution. Id. at 396. The Court rejected the constitutional challenge in a 4-3 decision, with the majority opinion written by Justice Roberts, the author of Ayala. The Court relied on the last sentence of Section 11, which clearly provides that lawsuits "may be brought against the Commonwealth in such manner[, in such courts] and in such cases as the Legislature may by law direct." The Court held that the General Assembly's passage of the Act simply directed the manner in which plaintiffs might sue government entities, precisely as authorized by Section 11. Id. The Court further indicated that the Pennsylvania Constitution is "neutral" with regard to "sovereign immunity," but that the framers of Article I, Section 11 "intended to allow the Legislature if it desired, to choose cases in which the Commonwealth should be immune." Id. (quoting Mayle, 388 A.2d at 716-17). The Court stated that it is "axiomatic" that the Commonwealth's authority to choose cases in which it would be immune to suit encompassed its authority to apply that immunity to its political subdivisions as well. Id.

The Court also rejected Carroll's reliance upon Ayala, which is notable given appellant's current insistence that Ayala is the case this Court should follow. The Court stressed that Ayala had abrogated a judicially created doctrine, and then noted that: "This

Court has repeatedly emphasized the fundamental distinction between the abrogation of a judicially created doctrine, as in Ayala, and the review, as here, of an act of the Legislature." Id. at 396-97. Further noting that the Court had previously recognized that the Legislature "may permissibly limit liability on the basis of a defendant's status, the Carroll Court held: "It is not our function to displace a rationally based legislative judgment. . . . Manifestly, it is within the province of the Legislature to determine that certain bars to suit are, in its judgment, needed for the operation of local government." Id. at 397.

In Smith v. City of Philadelphia, 516 A.2d 306, this Court specifically upheld the $500,000 damages cap of Section 8553(b) against claims that it violated the Fourteenth Amendment's Equal Protection Clause, and Article III, Sections 18 and 32 of the Pennsylvania Constitution.[9] First, the Court discussed Section 18, which provides that, except for workers' compensation matters, "in no other cases shall the General Assembly limit the amount to be recovered for injuries resulting in death, or for injuries to persons or property. . . ." PA. CONST. art. III, § 18. The Court broadly reaffirmed that Section 11

---

[9] The Smith plaintiffs apparently claimed that the Article III, Section 32 prohibition against "special laws" was violated by the damages cap, or at least the trial court granted a summary declaratory judgment in part on that basis. 516 A.2d at 308. In deciding the subsequent direct appeal, this Court stated that Section 32 has a "meaning and purpose sufficiently similar" to the federal Equal Protection Clause to warrant like treatment. Id. at 310 (citing Laudenberger v. Port Authority, 436 A.2d 147, 155 n.13 (Pa. 1981)). See also Lyles v. Commonwealth, 516 A.2d 701, 702 (Pa. 1986) (issue on appeal is whether damages cap in cases against Commonwealth violates Equal Protection clause of United States Constitution and Article III, Section 32 of Pennsylvania Constitution). The Smith Court did not explain precisely the theory by which the damages cap was said to violate Section 32. But, we have recognized that the "common constitutional principle at the heart of the special legislation proscription [of Section 32] and the equal protection clause is that like persons in like circumstances should be treated similarly by the sovereign." Pennsylvania Turnpike Comm'n v. Commonwealth, 899 A.2d 1085, 1094 (Pa. 2006).

authorizes the General Assembly "to regulate the manner, the courts and the cases in which suits may be brought against the Commonwealth" and that "the Framers intended that the legislature have complete control over suits brought against the Commonwealth." 516 A.2d at 309. The Court then expressly rejected the argument that Section 18 prohibits the General Assembly from enacting a damages cap such as Section 8553. The Court explained:

> As this Court stated in Singer v. Sheppard, 464 Pa. 387, 346 A.2d 897 (1975), "the full scope and meaning of [Article III, Section 18] should be considered in light of the evil intended to be remedied by its adoption." Id. at 396, 346 A.2d at 901. Article III, Section 18 was drafted in 1872 and 1873, and adopted in 1874 in response to the fact that certain powerful private interests had been able to influence legislation which limited recovery in negligence cases filed against them.
>
> In particular, the Framers were reacting to the passage of the Act of April 4, 1868, P.L. 58, which limited recoveries in negligence actions against railroads and other common carriers. The corporations who effected this legislation were perceived by the Framers as a privileged and powerful class of overreachers who had purchased special, self-serving legislation, and Article III, Section 18 was meant to prevent such powerful private interests from unduly affecting the legislative process. Consideration of the full scope and meaning of Section 18, therefore, reveals that the Framers were addressing themselves to private, not governmental defendants.
>
> It has been argued, however, that the language of Article III, Section 18 applies to all cases, not merely those involving private defendants ("in no other cases shall the General Assembly limit the amount to be recovered") and that the section should not be construed as applicable only to private parties. This argument ignores that the Framers would have had no occasion to apply the prohibition against limiting damages to government, for government, at that time, was immune from suit.

Id. at 309 (citations and footnote omitted). The Court therefore concluded that "Section 18 does not operate to restrict the General Assembly from providing for less than full

recovery for injuries to persons or property where the defendant is a governmental entity." Id. at 310.

Next, the Smith Court rejected Smith's claims that the damages cap violates equal protection principles by limiting the city's tort liability to $500,000, when there is no such limit on the tort liability of private parties. A plurality of the Court applied heightened (but not strict) scrutiny and determined that Section 8553 promotes an important governmental interest the realization of which is closely related to the subject classification. 516 A.2d at 311. Justices Zappala and Hutchinson, writing from a concurring posture, would have required only a rational basis level of scrutiny, and concluded that "[u]nder the present facts, this test was met." Id. at 312 (Zappala, J., concurring, joined by Hutchinson, J.).

In contrast to the Ayala and Mayle Courts, the Smith plurality, speaking of legislatively-conferred immunity, determined that it was "self-evident" that the governmental interest at stake – "preservation of the public treasury as against the possibility of unusually large recoveries in tort cases" – was indeed an important one, and that this interest was closely related to the classification established by the statutory scheme, because "only persons who might recover against the Commonwealth or its subdivisions are affected." 516 A.2d at 311. Accordingly, the Court concluded that the Act's limit on damages was not unconstitutional.

Before turning to appellant's specific constitutional challenges we note that this description of the decisional and legislative background in the area of governmental immunity should make clear that appellant's underlying claim that Ayala should be deemed controlling as a matter of *stare decisis* lacks merit. Ayala involved a judicially-created immunity doctrine, not a legislative one; the Carroll Court made plain that it understood the bedrock distinction when it passed upon the first challenge to the

Tort Claims Act, and the cases involving the legislative version of immunity have recognized the difference in focus required. With this background in mind, we turn to appellant's various challenges to Section 8553, to determine whether she has demonstrated that the provision clearly, palpably and plainly violates the Constitution.

## B. Equal Protection

Appellant first argues that the statutory damages cap violates equal protection principles under both state and federal law, notwithstanding prior decisions that it does not.[10] The equal protection provision of the Pennsylvania Constitution (or, more precisely, the non-discrimination provision) states that "[n]either the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right." PA. CONST. art. I, §

---

[10] Generally, when a provision of the Pennsylvania Constitution has a federal counterpart and the state charter is invoked to support a departure from established federal law -- most often, but not always, in areas involving individual rights -- the court should engage in a four-factor analysis to determine whether the Pennsylvania provision has a different scope or meaning. Edmunds, 586 A.2d at 894-95 (court should consider: 1) text of Pennsylvania constitutional provision; 2) history of the provision; 3) related case law from other states; 4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence). In other contexts, this Court has noted that federal and state equal protection rights are coextensive. Driscoll v. Corbett, 69 A.3d 197, 209 (Pa. 2013); Erfer v. Commonwealth, 794 A.2d 325, 332 (Pa. 2002). Here, there is no suggestion that the Pennsylvania provision is other than coextensive, and the parties have not engaged in a formal Edmunds analysis, although they have included general discussion of the Edmunds factors, as we do. See Robinson Twp. v. Commonwealth, 83 A.3d 901, 944 (Pa. 2013) (even where not required, analysis of Edmunds factors may still be helpful).

26.  The Equal Protection Clause of the Fourteenth Amendment of the U. S. Constitution provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. According to appellant, the Act violates both constitutional provisions for multiple reasons. First, the Act's damages cap reduced her tort recovery to 3.5% of the jury's verdict simply because a local agency, rather than a private entity, operated the school bus that injured her; and second, if she had been injured by a private tortfeasor, she would be entitled to recover the proceeds of any applicable insurance held by that tortfeasor. In this case, Pennsbury purchased $11 million in insurance coverage for the relevant period. Appellant argues that the limit on her recovery based upon this public/private distinction is unfair and improperly discriminates against her.

In considering the equal protection challenge to the statutory cap in <u>Smith</u>, this Court recognized that:

> [T]he Fourteenth Amendment does not absolutely prohibit the states from classifying persons differently and treating the classes in different ways. As this Court stated in <u>Laudenberger v. Port Authority of Allegheny County</u>, 496 Pa. [52,] 68, 436 A.2d [147,] 155 (1981), "The concept of equal protection . . . demands that uniform treatment be given to similarly situated parties. . . . If classifications are drawn, then the challenged policy must be reasonably justified." What counts as justification will depend upon which of three types a classification belongs to, what the governmental interest is in promulgating the classification, and the relationship of that interest to the classification itself.

<u>Smith</u>, 516 A.2d at 310-11 (quoting <u>James v. SEPTA</u>, 477 A.2d at 1306). Therefore, we must determine the proper level of scrutiny to apply to the alleged discriminatory classification in this case, *i.e.*, tort victims of local agencies like Pennsbury, whose damages recovery is capped by Section 8553, while at the same time considering the

nature of the governmental interest promoted by the classification, and the individual rights affected by it.

> The types of classifications are: (1) classifications which implicate a "suspect" class or a fundamental right; (2) classifications implicating an "important" though not fundamental right or a "sensitive" classification; and (3) classifications which involve none of these. Should the statutory classification in question fall into the first category, the statute is strictly construed in light of a "compelling" governmental purpose; if the classification falls into the second category, a heightened standard of scrutiny is applied to an "important" governmental purpose; and if the statutory scheme falls into the third category, the statute is upheld if there is any rational basis for the classification.

Smith, 516 A.2d at 311 (citation omitted). See also Whitewood v. Wolf, 992 F.Supp.2d 410, 424-25 (M.D. Pa. 2014) (summarizing approaches: strict scrutiny requires government to demonstrate that law is narrowly tailored to further compelling state interests; to survive intermediate scrutiny, statutory classification must be substantially related to important governmental objective; rational-basis review is satisfied if statutory classification is rationally related to a legitimate governmental purpose, and review for rationality is highly deferential to legislature, with challenger required to negate every possible basis for law).

Appellant argues that even using a rational basis test, the statutory distinction between plaintiffs who sue public tortfeasors and those who sue private entities must fall because the transportation of school students is not a core activity of the school district, and Pennsbury could have contracted its busing activities to a private entity, as many other school districts do. According to appellant, the fact that Pennsbury did not do so should not be determinative of her ability to recover full damages, and a holding that Pennsbury's choice dictates a damages decision against appellant is irrational. But, appellant acknowledges that intermediate scrutiny was previously applied to similar claims in Smith, and she says that intermediate scrutiny, at the very least, should apply

here. Notwithstanding these alternative arguments, appellant also argues that her right to a full tort recovery is a fundamental right that warrants strict scrutiny.

Fundamental rights generally are those which have their source in the Constitution. See Plyler v. Doe, 457 U.S. 202, 216 n.15 (1982); James v. SEPTA, 477 A.2d at 1306. Appellant claims that her right to full recovery from Pennsbury is at least important, and at most fundamental, because the right is found in multiple provisions of the Pennsylvania Constitution: the remedies clause of Article I, Section 11, the right to a jury trial in Article I, Section 6, and the guarantee against liability limits in Article III, Section 18. As we explain *infra*, we conclude that none of these constitutional provisions is violated by the statutory damages cap at Section 8553, and we reject, at the outset, appellant's argument that her construction of these provisions mandates a reconsideration of our prior approach and adoption of a strict scrutiny analysis. The decision in Smith was by a 5-2 vote: the three-Justice plurality opinion (on the question of the proper level of scrutiny) filed by Justice Flaherty, and joined by Chief Justice Nix and Justice McDermott, followed the prior majority decision in James v. SEPTA, 477 A.2d at 1306, which employed "heightened" or intermediate scrutiny, rather than holding that the right to sue the Commonwealth was fundamental and required strict scrutiny. The Smith plurality similarly determined that the "right" to a full tort recovery is not a fundamental right warranting strict scrutiny because the predicate right to bring suit against the Commonwealth or its political subdivisions is expressly limited by Article III, Section 18 and Article I, Section 11 of the Pennsylvania Constitution, which permit the General Assembly to limit recovery against governmental units. 516 A.2d at 311. But, the Smith plurality acknowledged that the right involved is an "important" one, and thus that the proper question is whether the Act's damages cap closely serves an important

governmental interest, in this instance, the protection of the public treasury against large and unpredictable tort recoveries.

Notably the two-Justice concurrence that provided the majority mandate on the equal protection question in <u>Smith</u> disagreed with the plurality insofar as it employed intermediate scrutiny, rather than mere rational basis review; obviously, those Justices likewise did not believe that a fundamental right was involved. 516 A.2d at 312 (Zappala, J., concurring, joined by Hutchinson, J.).[11] In any event, the <u>Smith</u> Court determined that the distinction drawn by the Legislature between plaintiffs suing public tortfeasors and plaintiffs suing private tortfeasors did not violate equal protection principles. <u>See</u> <u>also</u> <u>Lyles v. Commonwealth</u>, 516 A.2d 701, 703 (Pa. 1986) (damages cap of $250,000 in cases against Commonwealth does not violate equal protection under U.S. or Pennsylvania Constitution). Similar equal protection claims were raised and rejected in <u>James v. SEPTA</u>, <u>supra</u>, where the plaintiff failed to comply with a six-month statutory notice requirement before suing a local transportation agency for negligence, leading to the dismissal of his lawsuit on summary judgment. The plaintiff in <u>James</u> argued that "it is unlawful and unconstitutional for government tortfeasors and plaintiffs-against-the-government to be treated one way, while non-governmental tortfeasors and plaintiffs against non-governmental entities are treated in another." 477 A.2d at 1305. Applying intermediate scrutiny to the restriction on James's right to sue a Commonwealth agency without the limitation imposed by the statutory notice requirement, the Court determined that "it is self-evident that the prevention of stale and

---

[11] Neither of the dissenting Justices in <u>Smith</u> suggested that strict scrutiny was required. Indeed, it appeared that both were of the view that the cap could not even survive rational basis review. <u>See</u> <u>Smith</u>, 516 A.2d at 313 (Larsen, J., dissenting, joined by Papadakos, J.); <u>id.</u> at 318 (Papadakos, J., dissenting, joined by Larsen, J.).

fraudulent claims is an important and legitimate governmental objective," and upheld the statute. Id. at 1307.[12]

Without revisiting the disagreement between the Smith Court plurality and concurrence concerning whether rational basis review or intermediate scrutiny is the more appropriate approach to a claim like this, we have little difficulty in rejecting the notion that we should engage in **strict** scrutiny; and, consistently with James, which represented a majority view, we will employ intermediate scrutiny. Doing so, we conclude, as the Smith plurality did, that this test is met through the cap's close relationship to important and legitimate governmental goals, particularly the bedrock concern with the continued financial viability of local agencies like public school districts.

Appellant takes issue with the "public fisc" rationale for a damages cap, arguing that it should not be determinative in a case like this, where Pennsbury actually purchased insurance coverage that, she alleges, could be used to satisfy a large part of the jury's verdict without endangering Pennsbury's treasury. Appellant rejects the counterargument that what makes the purchase of insurance affordable for school districts like Pennsbury is the very existence of a damages cap for certain types of claims, and that if the cap were struck down, no insurance company would cover the risks involved. Appellant calls this counterargument speculation and argues that, in any event, Pennsbury has a "large annual budget" that it can use to pay for insurance premiums, or it could self-insure or participate in risk pooling. Appellant's Brief at 30-31. Appellant adds a policy argument that the cap encourages governmental complacency,

---

[12] The statute at issue, 66 P.S. § 2036, was repealed and later replaced by 42 Pa.C.S. § 5522(a) (notice required to governmental unit of intent to sue for damages within six months of injury).

and that Ayala was correct to eliminate common law immunity and thus create an incentive for safer practices to avoid liability in the first place.

Preliminarily, we note that the existence, or availability, of insurance coverage is ordinarily not relevant or admissible in the context of tort litigation. See, e.g., Price v. Guy, 735 A.2d 668, 671 (Pa. 1999) (jury instruction regarding plaintiff's election of limited tort option for motor vehicle insurance was reversible error); Trimble v. Merloe, 197 A.2d 457, 458 (Pa. 1964) (in tort cases, "consideration of the affluence of the defendant, his ability to pay, or his liability insurance coverage is improper, irrelevant, prejudicial, and clearly beyond the legally established boundaries."). See also Pa.R.E. 411 ("Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully. But the court may admit this evidence for another purpose, such as proving a witness's bias or prejudice or proving agency, ownership, or control."). We recognize, of course, that the question of the availability of insurance coverage arises here in the context of a constitutional challenge to a statute, where the existence and ramifications of insurance coverage are raised by appellant as a partial basis for striking down the statute as invalid; but still, for purposes of that constitutional challenge, it is difficult to see why the availability of insurance in a particular case would control the inquiry.

In any event, to the extent that appellant challenges the General Assembly's decision to allow tort recovery, but subject to a liability cap, given the theoretical availability of insurance for public entities, the proper question is whether the General Assembly could determine, faithfully with the Constitution, that such a scheme struck the appropriate balance. At heart, this is a question of policy addressed to the General Assembly itself, which has the greater capacity for broad analysis of such complex

questions as the implications of self-insurance or risk-sharing pools,[13] or the actual budgetary ability of school districts and other agencies to carry insurance under various scenarios of uncapped liability. Importantly, the Act's provisions were based on a report and recommendations prepared in 1978 by the General Assembly's Joint State Government Commission, after a detailed study by a task force consisting of judges, attorneys and citizens, and the Commission's report included a specific recommendation that tort recovery be capped where immunity was waived. See "Sovereign Immunity," Joint State Government Commission (May 1978), 19-20, http://jsg.legis.state.pa.us/resources/documents/ftp/publications/1978-211-Sovereign%20Immunity.pdf (retrieved July 14, 2014) (in addition to constitutional authority in Section 11 for Legislature to direct manner in which Commonwealth may be sued, "strong public policy dictates" that liability should be capped).

Obviously, Pennsbury – which is currently protected under Section 8553 from tort liability in excess of $500,000 in individual cases – purchased its excess insurance coverage for risks other than lawsuits arising from personal injuries like appellant's. The mere purchase of such insurance coverage, aimed at other kinds of risks, does not entitle appellant to its proceeds as a constitutional matter. Nor does the purchase of such coverage somehow act as a waiver of the statutory cap. See, e.g., Supler v. School Dist., 182 A.2d 535 (declining to abolish governmental immunity; rejecting argument that school district's purchase of insurance policy effected waiver of immunity).

More fundamentally, the argument begs the constitutional question: the assessment and balancing of alternative or conflicting policies to resolve the difficult and

---

[13] Notably, the General Assembly in fact included provisions in the Act which specifically authorize participation by local agencies in risk-sharing pools, and self-insurance, while at the same time maintaining the limitation on damages codified in Section 8553. 42 Pa.C.S. § 8564 (liability insurance and self-insurance).

complex questions raised by a tragic situation such as appellant's are not particularly amenable to resolution by an appellate court with a limited, fact-specific record, in the context of a constitutional challenge. We have little difficulty seeing some facial merit in the interests ably identified from all quarters in this case. Appellant is not an organization or a lobbyist: she is an injured plaintiff, who suffered a catastrophic injury, who wants the tortfeasor to take responsibility and make her whole. This is a simply-stated but powerful position. On the other hand, local agencies and municipalities have very real concerns about their ability to preserve their financial stability so that they may continue to serve the public and provide critical services to their citizens, especially their poorest residents.[14] That unpredictable and catastrophic losses can wreak financial havoc is another simply-stated but powerful argument.

The *amicus curiae* briefs filed by the City of Philadelphia, the City of Pittsburgh, Allegheny County, and the Commonwealth give us particular pause before we would displace the General Assembly's balancing of these competing concerns. The government entities suggest that the requested elimination of the damages cap codified in Section 8553 of the Act (and in Section 8528 with regard to the Commonwealth) would have disastrous financial consequences. According to these *amici*, the cap provides some measure of predictability that enables them to plan budgets and provide consistent services to residents. Even with the cap in place, *amici* assert, they face a significant number of claims and exposure. We recognize appellant's complaint that many of these assertions are outside the limited record in this case, and we are not in a position to pass upon their specific accuracy. But, neither do we leave common sense at the courtroom

---

[14] According to *amici*, 26.2% of Philadelphia residents and 22.5% of Pittsburgh residents are living with incomes below the poverty line. Brief of the City of Philadelphia, the City of Pittsburgh, and Allegheny County in Support of Appellee, at 7.

door.   Whether the statements in the briefs of twenty-eight interested *amici* are factually correct, they are a cautionary tale that this constitutional challenge implicates core public policy questions, concerning both the propriety and the amount of a statutory damages cap, that the political branches are better positioned to weigh and balance.

In any event, it is not difficult to imagine the adverse budgetary consequences for local agencies of even one multi-plaintiff lawsuit involving severe injuries, like those that led to the $11 million verdict here, or even multiple deaths, if liability were uncapped. See, e.g., Smith, supra (forty-four separate actions on behalf of seventy-two claimants involving property damage, personal injury and death after gas explosion).   The Commonwealth asserts that removing the cap would essentially "transfer the power of the purse from elected officials to unelected and unaccountable juries."   Commonwealth Brief in Support of Appellee, at 4.   The statement is dramatic to be sure, but not fanciful. The Commonwealth notes that the single verdict amount in this case -- $11 million – is as much or more than the current state General Fund appropriation for: cancer prevention and treatment; State Police municipal police training, forensic laboratory support, automated fingerprint identification and gun checks combined; PEMA storm disaster relief; the State Ethics Commission; all state senators' salaries and expenses combined; the Pennsylvania Human Relations Commission; and the Capitol Police. Commonwealth Brief at 31 (citing Pennsylvania Office of the Budget, "2013-14 Enacted Budget – Line Item Appropriations" (June 2013), available at www.budget.state.pa.us (Past Budgets)).

The prospect that a single large damages award in a negligence case filed against a public tortfeasor – such as a school district – could spell financial ruin for that public defendant is not a new one.  As early as 1888, this Court ruled that a public school student who was severely burned as the result of the school janitor's undisputed

negligence, was not entitled to recover damages from the school district, as the district was funded by "public money," should properly be considered "a great public charity," and thus be immune from suit. Ford v. School District, 15 A. at 815-16. The Court reasoned:

> [T]o make school-districts responsible for the misfeasance of their officers would, in many cases, prove injurious, if not destructive, to the public welfare. A weak and poor district is saddled with a heavy bill of damages,—in this case, for instance, because a child has been burned through the negligence of the janitor; in another, perhaps, because there has been no fire, and a pupil's limbs have been frozen, or because the house was open, and it has caught cold; it has been maltreated by the teacher, or has contracted spine disease, because of improper seats, etc.,—and, as a consequence, the schools must be closed, and the ordinary taxation, perhaps for years, together with the state appropriation, must be applied to the payment of the bill. The rule heretofore has been that individual advantage must give way to the public welfare; but the proposition of the plaintiff is to make individual grievance override the public good,—make the public funds the primary source of individual compensation. A child has been injured by the negligence of the school janitor; therefore stop the schools, and appropriate the money of the state and district for the purpose of compensating the child and its parents. This is certainly running the idea of individual compensation to the last degree of absurdity. It is an attempt to open a new field for this kind of litigation,—profitable, indeed, to the individual, but ruinous to the public; hence one that we are not disposed to encourage.

Id. The Court's language, though antiquated and insensitive -- particularly under a tort scheme offering no recovery at all – is again a reminder of the larger policy questions implicated by the constitutional question posed.

Appellant seeks a holding from this Court that the statutory damages cap must be stricken because it unlawfully discriminates against plaintiffs who sue public tortfeasors, and equal protection principles require that such plaintiffs should instead be permitted to seek unlimited damages against those tortfeasors, as if they were suing private entities. For the reasons we have explained, appellant's position is difficult to sustain because she essentially asks this Court to make uniquely legislative judgments, such as whether it is

"better" to provide for unlimited governmental liability in tort to individual private parties, or is it "better" to limit such liability in order to avoid curtailing services on which the public as a whole depends for its health, safety and welfare. In such cases, the scale is "weighted on both sides with legitimate interests" and "this recognition should [end] the inquiry." Reichley v. North Penn Sch. Dist., 626 A.2d 123, 129 (Pa. 1993) (internal quotation marks omitted). See also Love v. City of Philadelphia, 543 A.2d 531, 533 (Pa. 1988) ("The juridicial [sic] concept that where there is a wrong there must be a right often depends on the wisdom and large responsibility of the legislature. What rights for what wrongs are generally their prerogative and apportioned in the exercise of their many responsibilities and competing needs."). While we have genuine sympathy for appellant's individual situation (and particularly in light of the fact that the amount of the cap has not been increased, or adjusted for inflation, in the thirty-six years since its adoption), we conclude that appellant has not shown that the **classification** created by the Section 8553 damages cap – distinguishing between plaintiffs suing public tortfeasors and those suing private defendants – clearly, palpably and plainly violates equal protection principles. The protection provided by the cap for local government entities is closely related to important and legitimate legislative objectives, perhaps even moreso today than at the time Smith and Carroll were decided in the 1980s.[15]

Outside the constitutional context, to the extent genuine questions might be raised regarding the **amount** of the cap, we note that such questions require detailed study and

---

[15] Various *amici* provide support for the general proposition that numerous Pennsylvania cities are financially distressed due to increased costs and reduced revenues. See, e.g., Brief of the Commonwealth, at 28 (there are currently twenty-one financially distressed municipalities in Pennsylvania, including Pittsburgh, Scranton, Harrisburg, Altoona and Johnstown); Brief of County Commissioners Association, *et al.* at 8-9 ("no state is more representative of this national trend than the Commonwealth of Pennsylvania, where numerous local governments have been burdened with rising costs, looming pension liabilities, and ever-shrinking finances").

analysis of all relevant policy factors in a complicated balancing act that is properly addressed to the General Assembly.  See, e.g., Program Admin. Serv. Inc. v. Dauphin Cty. Gen. Auth., 928 A.2d 1013, 1017-18 (Pa. 2007) ("In particular, it is the Legislature's chief function to set public policy and the courts' role to enforce that policy, subject to constitutional limitations."); Reichley v. North Penn, 626 A.2d at 129 ("The adversarial judicial system is not an appropriate forum for analyzing whether this legislation works well or poorly, as intended or in ways unforeseen.  If a statute does not work as expected, the legislature is the appropriate body to make the judgment and enact corrective legislation.").  As we have noted, the Act was adopted by the General Assembly after it established a task force consisting of judges, various Commonwealth departments, trial attorneys and other citizens "to 'conduct a thorough review and analysis of the benefits and costs accruing from a statutory revision or abolition of the sovereign immunity defense.'"  General Assembly of the Commonwealth of Pennsylvania, Joint State Government Commission, *Sovereign Immunity* (May 1978), 2 (quoting House Resolution No. 226 of 1974).  The task force, after making recommendations regarding proposed legislation that would become the Act, acknowledged that subsequent experience under the proposed regime of "uniform maximums of recovery" would be "beneficial in future legislative consideration of limitations" on damages.  Id. at 20.  In fact, after more than three decades of such experience, it appears that the General Assembly is currently considering legislation to increase the damages cap at Section 8553(b) to $10,000,000.  See H.B. 2032, Reg. Sess. of 2014 (Pa. Feb. 19, 2014) (introduced and referred to Committee on Judiciary on February 19, 2014).  But, with regard to the discrete justiciable equal protection question posed here, which turns on the classification of public vs. private tortfeasors, we hold that Section 8553's existing limitation on damages passes constitutional muster.

We must now consider whether the Section 8553 damages cap violates other provisions of the Pennsylvania Constitution as argued by appellant. As an interpretive matter, we have noted that:

> the polestar of constitutional analysis undertaken by the Court must be the plain language of the constitutional provisions at issue. A constitutional provision requires unstrained analysis, "a natural reading which avoids contradictions and difficulties in implementation, which completely conforms to the intent of the framers and which reflects the views of the ratifying voter." Jubelirer v. Rendell, 598 Pa. 16, 953 A.2d 514, 528 (2008); Commonwealth ex rel. Paulinski v. Isaac, 483 Pa. 467, 397 A.2d 760, 766 (1979). Stated otherwise, the constitutional language controls and "must be interpreted in its popular sense, as understood by the people when they voted on its adoption." Stilp v. Commonwealth, 588 Pa. 539, 905 A.2d 918, 939 (2006); Ieropoli v. AC&S Corp., 577 Pa. 138, 842 A.2d 919, 925 (2004).

In re Bruno, __ A.3d __, __ 2014 WL 4915942 at *17 (Pa. 2014).

## C. Article III, Section 18

Appellant claims that the cap violates the plain language of Article III, Section 18, because it imposes a limitation on the amount of damages that can be recovered. Article III, Section 18 provides:

> The General Assembly may enact laws requiring the payment by employers, or employers and employes jointly, of reasonable compensation for injuries to employes arising in the course of their employment, and for occupational diseases of employes, whether or not such injuries or diseases result in death, and regardless of fault of employer or employe, and fixing the basis of ascertainment of such compensation and the maximum and minimum limits thereof, and providing special or general remedies for the collection thereof; **but in no other cases shall the General Assembly limit the amount to be recovered for injuries resulting in death, or for injuries to persons or property**, and in case of death from such injuries, the right of action shall survive, and the General Assembly shall prescribe for whose benefit such actions shall be

prosecuted.  No act shall prescribe any limitations of time within which suits may be brought against corporations for injuries to persons or property, or for other causes different from those fixed by general laws regulating actions against natural persons, and such acts now existing are avoided.

PA. CONST. art. III, § 18 (emphasis added).  As stated earlier, this Court upheld the damages cap against an identical claim in Smith v. Philadelphia.  See also Lyles v. Commonwealth, 516 A.2d 701 (limitation on damages in tort cases against Commonwealth does not violate Article III, Section 18 of Pennsylvania Constitution).  The Smith Court considered the history of Section 18, noting that it was adopted in 1874 in response to anticipated legislative "overreaching" by private corporations.  516 A.2d at 309.  Appellant has not forwarded any persuasive basis for us to disturb this analysis.

Additional support for this historical explanation of the purpose of Section 18 is found in Singer v. Sheppard, 346 A.2d 897 (Pa. 1975), where the Court upheld the No-Fault Motor Vehicle Insurance Act's limitation on tort recovery against the plaintiff's claim that those limitations violated Section 18's proscription against limits on the amount of recovery for personal injuries.  The Singer Court recognized that Section 18's predecessor, Article III, Section 21, of the Constitution of 1874, was adopted in direct response to an 1868 statute that "limited the maximum amount recoverable by a plaintiff in a negligence action against a common carrier to $3,000 for personal injuries and $5,000 for injuries resulting in death."  346 A.2d at 900.  See, e.g., Thirteenth & Fifteenth Sts. Pass. R. Co. v. Boudrou, 1880 WL 13607 *6 (Pa. 1880) (amount of damages recoverable by plaintiff due to railroad's negligence was unconstitutionally limited by statute to $3000; limitation of recovery to sum less than actual damage "is palpably in conflict with the right to remedy by a due course of law").  In 1915, Section 21

was amended to allow for the enactment of a new Workmen's Compensation Act, which was expressly permitted to provide limits on recovery against employers, and in 1967, Section 21 was renumbered as Article III, Section 18.  Singer, 346 A.2d at 900-01.  The analysis in Smith is consistent with the precepts that we must consider the meaning of a constitutional provision "in light of the evil intended to be remedied by its adoption," Lewis v. Hollohan, 103 Pa. 425, 430 (1883), and that we must consider the intent of the framers and the views of the "ratifying voter."  Jubelirer, 953 A.2d at 528.

In both Singer and Smith, this Court explained that the specific evil aimed at by now-Section 18 was the inappropriate influence on legislation exercised by common carriers, *i.e.*, railroad companies, and in the broader sense, powerful private corporations with an incentive to seek to limit the damages recoverable through lawsuits arising from accidents.  Moreover, the final sentence of Section 18 yields further support for this position, as it ensures that any statute of limitations on suits against **corporations** must be the same as, *i.e.*, no shorter than, the limitations period on actions against natural persons.  See PA. CONST. art. III, §18 ("No act shall prescribe any limitations of time within which suits may be brought against corporations for injuries to persons or property, or for other causes different from those fixed by general laws regulating actions against natural persons. . . ."); Lewis, supra (purpose of Article III, Section 21 was to nullify legislation limiting amount to be recovered for injuries or death as well as limiting time within which suits could be brought against corporations; any time limitations applicable to suits against corporations must be same as those against natural persons); In re Grape Street, 103 Pa. 121, 124 (1883) ("The design of this part of the Constitution is sufficiently obvious; it is to put the citizen and corporations on the same general plane of right when

they come into a court of justice, and thus, in part, at least, to break down the invidious distinction theretofore made, by the legislature between natural persons and corporations."); Malenkaitus v. Horwitz, 47 Pa. D. & C. 643, 648 (Lackawanna Cty. 1943) (Article III, Section 21 prohibition applies solely to private corporations, so law requiring timely notice of lawsuit against City of Scranton does not violate provision).

It is true that the language of Section 18 broadly states that limits on recovery such as those enacted by the Workmen's Compensation Act shall apply in "no other cases," and appellant argues that this language should be read literally and in all contexts.  But, as the Smith Court explained, at the time Section 18 was drafted – and for more than 100 years afterward, until Ayala and Mayle were decided – government entities enjoyed common law tort immunity, and so "the Framers would have had no occasion to apply the prohibition against limiting damages to government."  Smith, 516 A.2d at 309.

We also reject appellant's argument that the Court's recent decision in Robinson Twp., 83 A.3d 901, commands a different result.  First, the Court in Robinson Twp. considered the validity of Act 13 of 2012, comprehensive legislation which amended the Pennsylvania Oil and Gas Act, in light of the Environmental Rights Act, Article I, Section 27 of the Pennsylvania Constitution.[16]  The case did not involve the Tort Claims Act or a challenge under Section 18.  Second, the proposition for which appellant cites

---

[16] Article I, Section 27 provides: "The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people."

Robinson Twp. (a proposition representing a plurality view) does little to advance her cause, since the plurality also acknowledged that we may consider factors other than the plain language of a constitutional provision in determining whether legislation is unconstitutional. 83 A.3d at 945-46 ("If the words of a constitutional provision are not explicit, we may resort to considerations other than the plain language to discern intent, including, in this context, the occasion and necessity for the provision; the circumstances under which the amendment was ratified; the mischief to be remedied; the object to be attained; and the contemporaneous legislative history."). Moreover, "[a] specific provision will prevail over a general principle found elsewhere but, because the Constitution is an integrated whole, we are cognizant that effect must be given to all of its provisions whenever possible." Id. at 946.

Reading Article III, Section 18 together with Article I, Section 11 corroborates the propriety of this Court's prior construction of Section 18. As already stated above, and as further discussed below, Section 11 expressly provides the General Assembly the power to limit the damages recoverable in certain lawsuits, and Section 18 does not dictate a different result. PA. CONST. art. I, §11 ("Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct."); Smith, 516 A.2d at 309-10 (Section 18 does not undermine General Assembly's authority under Section 11 to limit amount of recovery in tort actions against "governmental entities," or abolish those actions completely); Freezer Storage, Inc. v. Armstrong Cork Co., 382 A.2d 715, 721 (Pa. 1978) ("The Legislature has not limited the recovery available under a cause of action, but eliminated that cause of action altogether in certain cases. It is senseless to hold that, although Article I, Section 11 authorizes

the Legislature to abolish a cause of action, any such abolition is nonetheless void because it constitutes a diminution of recovery for a harm inflicted in violation of Article III, Section 18. . . .").  See also Joint State Government Commission, *Sovereign Immunity,* 19 (Article III, Section 18 must be read in light of Commonwealth's prior immunity and with Legislature's specific constitutional authority from Article I, Section 11 to waive that immunity in such manner as it directs; General Assembly thus "may affix any limitations it chooses to its waiver").  We therefore reject appellant's invitation to disavow our prior readings of Article III, Section 18.

## D.  Article I, Section 11

Appellant argues that the statutory damages cap violates Article I, Section 11. Section 11 provides:

> All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

PA. CONST. art. I, § 11.   Appellant correctly asserts that this "remedies clause" guarantees "open courts" as a general proposition, but it is clear from a reading of the entire provision that the guarantee is not without limits.   Indeed, Section 11 expressly authorizes the General Assembly to "direct" exactly how the Commonwealth may be subjected to suit.   "This concluding sentence of Article I, Section 11 is an integral, unequivocal and controlling portion of the Constitutional provision upon which plaintiff would rely," and pursuant to that sentence, this Court has upheld the Act's exceptions to generalized governmental immunity.   Carroll, 437 A.2d at 396.   See also 1 Pa.C.S. §

2310 (pursuant to Section 11, it is General Assembly's intent that Commonwealth, its officials and employees shall remain immune to suit except where immunity is specifically waived). As discussed in more detail above, the Carroll Court expressly held that the Act's limitations on liability do not violate Section 11, and this holding is in line with prior cases which examined the General Assembly's modification or outright abolition of well-established causes of action, and upheld those particular legislative adjustments. See Freezer Storage, 382 A.2d at 720-21 (societal conditions occasionally require law to change in way that denies plaintiff cause of action available in earlier days; Legislature did not violate Section 11 by redefining rights of builders, customers, and third parties by establishing twelve-year statute of repose); Singer, 346 A.2d at 903 (no one has vested right in continued existence of immutable body of negligence law). Contrast Ieropoli, 842 A.2d at 930 (where plaintiffs' causes of action accrued before enactment of statute eliminating those causes of action, statute's application to plaintiffs' case is unconstitutional under Article 1, Section 11).

Appellant also argues that, because Section 11 is part of the Declaration of Rights contained in Article I of the Pennsylvania Constitution, reading the open courts provision as "taking away individual rights" is a misapprehension of the purpose of Article I. Appellant's Brief at 45 (citing Robinson Twp., 83 A.3d at 948-49). But, appellant's argument is unavailing because, unlike other provisions in Article I – such as Section 27, the Environmental Rights Amendment, which was at issue in Robinson Twp. – Section 11 expressly includes a limitation on the individual right to "open courts" and remedies therein. Thus, Section 11 itself authorizes the Legislature to enact laws that direct the way in which a plaintiff might pursue her right to a judicial remedy against the Commonwealth. Moreover, the Carroll Court explained that the Legislature's authority granted in Section 11 with regard to suits against the Commonwealth "surely" extends to

directing the manner in which political subdivisions may be sued as well. Carroll, 437 A.2d at 396. See generally Commonwealth v. Moir, 49 A. 351, 352 (Pa. 1901) ("Municipal corporations are agents of the state, invested with certain subordinate governmental functions for reasons of convenience and public policy. They are created, governed, and the extent of their powers determined, by the legislature, and subject to change, repeal, or total abolition at its will."). See also Mascaro, 523 A.2d at 1123 (expressed legislative intent of Act's limited exceptions to immunity is "to insulate political subdivisions from tort liability").[17]

The General Assembly therefore acted within its constitutional authority provided in Article I, Section 11, when it adopted legislation re-establishing governmental immunity, and providing for the limited waiver of that immunity, in Chapter 85 of the Judicial Code, entitled "Matters Affecting Government Units." Chapter 85 includes all provisions regarding the Commonwealth's immunity, 42 Pa.C.S. §§ 8521-8528, as well as the immunity of "local parties," 42 Pa.C.S. §§ 8541-8564. As this Court held in Smith, the General Assembly also properly acted within its Section 11 authority when it adopted

---

[17] We are aware that in Specter v. Commonwealth, 341 A.2d 481, 482 (Pa. 1975), the Court ruled that the tort "immunity enjoyed by the Commonwealth" pursuant to Article I, Section 11, did not extend to the Pennsylvania Turnpike Commission, which the Specter Court determined was "separate and apart from the Commonwealth." Id. at 493. Specter was based upon Ayala's holding that sovereign immunity did not apply to political subdivisions and governmental entities other than the Commonwealth. Specter was thus obviously undermined when the General Assembly adopted the statutory regime reflected in the Act, which expressly applies tort immunity to political subdivisions, with certain enumerated exceptions. 42 Pa.C.S. §§ 8541-8553. See also 71 P.S. § 732-102 (defining "Commonwealth agency" to include "independent agencies" like Pennsylvania Turnpike Commission); In re Thirty-Third Statewide Investigating Grand Jury, 86 A.3d 204 (Pa. 2014) (undisputed that Pennsylvania Turnpike Commission is Commonwealth agency; Commission employees could not invoke attorney-client privilege to preclude Commonwealth's Office of Attorney General access to Commission documents during grand jury investigation of Commission's operation).

the damages cap in actions against local governments in Section 8553 of the Act. 516 A.2d at 309-10. Appellant has not advanced any convincing argument why Smith should be overruled, or that the cap clearly, palpably, and plainly violates Section 11.

**E. Separation of Powers**

Article V, Section 1 of the Pennsylvania Constitution provides that the "judicial power of the Commonwealth shall be vested in a unified judicial system. . . ." Appellant argues that, because remittitur is an available, discretionary judicial tool, applicable only in cases where a judge determines that a jury's verdict is excessive, the damages cap improperly acts as a "legislative remittitur," and as a result, the General Assembly has overstepped its bounds into the judiciary's territory.

Appellant is correct that, in Pennsylvania, a party can file a motion for remittitur or reduction of the amount of a jury's verdict, and the decision on a requested remittitur is addressed to the discretion of the trial court. See Pa.R.C.P. No. 227.1(a)(4) (after trial and upon written motion for post-trial relief filed by any party, court may affirm, modify or change the decision). A remittitur or "[j]udicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant. The question is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption." Haines v. Raven Arms, 640 A.2d 367, 369 (Pa. 1994). The matter is "peculiarly within the discretion of the trial court and will not be reversed unless an abuse of discretion or an error of law has been

committed." Id. (quoting Scaife Co. v. Rockwell-Standard Corp., 285 A.2d 451, 456 (Pa. 1971)).

Appellant is also correct that "the executive, legislative, and judicial branches of government are equal and none should exercise powers exclusively committed to another branch." Jefferson Cty. Court Appointed Employees Ass'n v. Pa. Labor Rels. Bd., 985 A.2d 697, 702 n.8 (Pa. 2009) (citing Beckert v. Warren, 439 A.2d 638, 642 (1981)). But, appellant's argument that the statutory damages cap operates as a mandatory remittitur improperly imposed upon her court case by the legislative branch is meritless. The concept of a discretionary remittitur – granted by a judge after a trial and jury verdict rendered on a given set of facts – is totally different from the application of the damages cap codified at Section 8553. For one thing, "judicial" acts are those which determine the existing law in relation to existing facts, and which apply the law to the subject matter before the court, while a "legislative" act is a determination of what the law will be in the future. See, e.g., WHITE, COMMENTARIES ON THE CONSTITUTION OF PENNSYLVANIA, 297. See also Evans v. Alaska, 56 P.3d 1046, 1056 (Alaska 2002) (statutory cap on damages is not remittitur; it is instead general alteration applied to all cases, and is not case- and fact-specific like remittitur).

As we have explained, the General Assembly has the authority under Article I, Section 11 to define the manner in which governmental entities may be sued in tort, and it has determined that such lawsuits may proceed in limited circumstances, subject to a uniform limitation on damages. In adopting the damages cap, the General Assembly did not usurp the judiciary's exclusive, discretionary authority to grant remittitur in individual

cases; it set a statutory maximum recovery in all negligence cases against public tortfeasors.

> This Court would encroach upon the Legislature's ability to guide the development of the law if we invalidated legislation simply because the rule enacted by the Legislature rejects some cause of action currently preferred by the courts. To do so would be to place certain rules of the "common law" and certain non-constitutional decisions of courts above all change except by constitutional amendment. Such a result would offend our notion of the checks and balances between the various branches of government, and of the flexibility required for the healthy growth of the law.

Freezer Storage, 382 A.2d at 721. Cf. Seitzinger v. Commonwealth, 25 A.3d 1299, 1304-07 (Pa. Cmwlth. 2011) (separations of powers doctrine violated if legislative action impairs independence of judiciary in administration of justice; no violation where Legislature had authority through Supreme Court's rules permitting reasonable counsel fees to enact limitation on contingent fees for attorneys in workers' compensation cases).

Notably, the General Assembly's task force, which studied the viability of a limited waiver of governmental immunity, expressly considered and rejected remittitur as a possible alternative to legislatively capping damages in such cases: "While it could be argued that the court's power to reduce excessive verdicts would act as a restraint, the effect of relying on judicial oversight would be to transfer the exclusive authority over the public purse from the Legislature to the judiciary." Joint State Government Commission, *Sovereign Immunity*, 20. Appellant's argument is creative, but clearly remittitur is distinguishable from the statutory cap, for separation of powers purposes, and the cap is specifically designed to mandate a limitation even where a judge might decline to apply a discretionary remittitur. We find no violation of the separation of powers in the Act's cap on tort damages.

**F. Article I, Section 6**

In a related, creative argument, appellant claims that application of the damages cap to reduce her jury's verdict violated her constitutional right to a jury trial. Article I, Section 6 of the Pennsylvania Constitution provides, in relevant part: "Trial by jury shall be as heretofore, and the right thereof remain inviolate." Appellant's jury trial argument fails for multiple reasons.

This particular language first appeared in the Constitution of 1790, and has remained unchanged, although it originally appeared at Article 9, Section 6. See GORMLEY, *et. al.*, THE PENNSYLVANIA CONSTITUTION: A TREATISE ON RIGHTS AND LIBERTIES (2004), 235 (Rhoades, Jessica B., *Trial By Jury*, § 9.2). Notably, at that time – that is, "heretofore" – there was no common law right to a jury trial in proceedings against the Commonwealth, as the state was immune from suit. See Ligat v. Commonwealth, 19 Pa. 456 (1852) ("A sovereign state is not liable to an action at law against her consent, and the right of trial *by jury* has, therefore, no existence in such a case.") (emphasis in original); WHITE, COMMENTARIES ON THE CONSTITUTION OF PENNSYLVANIA, 69-70 (in any case where state allows itself to be sued it can fix mode of trial without jury, since at common law state could not be sued at all).

Appellant attempts to dispute this point, declaring that a "Pennsylvanian was allowed to sue a local government unit for negligence in 1790." Appellant's Brief at 54. Appellant argues that immunity as described in Russell v. Men of Devon – the law in England at the time – was not actually applied in a Pennsylvania case until 1888, *i.e.*, in Ford, as discussed earlier. But, in Part IV.A above, we have already noted that the status of immunity in the nineteenth century was more varied and complicated than appellant's Ford-based focus. Moreover, in making this point, appellant does not actually argue that there was a right to trial by jury in all negligence cases against a local

government in 1790, even if the broader concept of immunity had not yet been adopted in Pennsylvania. Appellant relies instead on general statements in much later cases that it is "the exclusive province of the jury" to hear evidence and decide damages in negligence cases, and broadly declares that the "right to sue governmental units for negligence includes the right to have a jury determine damages." Appellant's Brief at 54-55 (citing Doe v. Raezer, 664 A.2d 102, 105 (Pa. Super. 1995) (reversing trial court's grant of remittitur; judicial reduction of jury award appropriate only if award is plainly excessive and exorbitant) (superseded in part on other grounds by Vogelsberger v. Magee-Womens Hosp., 903 A.2d 540 (Pa. Super. 2006)) and Matheny v. West Shore Country Club, 648 A.2d 24 (Pa. Super. 1994) (affirming denial of motion for additur or new trial; jury's award of damages not so low as to "shine forth like a beacon")).

Appellant also relies on Dean v. New Milford Twp., 1843 WL 5096, where the Court allowed an action to go forward against an incorporated county for damages caused by negligent maintenance of a roadway. But, instrumental to the Court's decision in Dean was the fact that the defendant municipality had a fund out of which to pay damages to the plaintiff, and on this basis, the Dean Court distinguished earlier cases which had disallowed such lawsuits. Pennsbury also counters appellant's argument by citing other pre-Dean cases where the Court rejected attempts to sue local government entities. See, e.g., Mayor v. Randolph, 1842 WL 4889 *3 (Philadelphia as municipal corporation had authority to stop creek's course when grading streets; plaintiffs whose property was flooded as result could not inquire into motives or purpose for city's doing so); Green v. Borough of Reading, 1840 WL 3772 *5 (incorporated borough with officers authorized to repair streets not subject to suit regarding manner of repairs; "plaintiff will find he has not been injured" because "advantage to the whole town soon raises property in every part of it, and is to the advantage of every inhabitant"). These decisions indicate that the right to

sue local governments was considered, and immunity applied, on a case-by-case basis in early years, irrespective of whether a jury trial was allowed. See, e.g., Mayor, supra (court erred in allowing jury to determine municipality's purpose in stopping up creek). Moreover, the cases also recognize a broad principle – quite relevant here – that "individual advantage must give way to the public welfare," and that an "individual grievance" may not "override the public good" and "make the public funds the primary source of individual compensation." Ford, 15 A. at 815-16. See also Green, supra (advantage to whole town of improved public streets is to advantage of every inhabitant). The bottom line is that the right to a jury trial as heretofore is not so clear and simple as appellant would have it.

In any event, appellant's argument based on her right to a jury trial is obviously misdirected. We have stated generally that Article 1, Section 6 "does not require an absolutely unfettered right to trial by jury." Parker v. Children's Hospital, 394 A.2d 932, 938 (Pa. 1978) (statute requiring that medical malpractice cases first be subject to arbitration before appeal *de novo* with jury trial did not violate Section 6; Section 6 guarantee of right to jury trial should not be construed in such manner as would exclude any other method for disposing of disputes). What is most important is that the right to a jury trial "must not be burdened by the imposition of onerous conditions, restrictions or regulations which would make the right practically unavailable." Application of Smith, 112 A.2d 625, 629 (Pa. 1955) (Court upheld statutory scheme which mandated compulsory arbitration for certain minor cases, and then allowed jury trial upon appeal from decision of arbitrators; Court found that statute did not create "onerous" burden on right to jury trial).[18] Appellant relies on the reference in Application of Smith to "onerous"

---

[18] Without striking down the compulsory arbitration statute, the Court also suggested that the Lancaster County fee for the payment of arbitrators was too high for very small cases: "The rule adopted in Lancaster County which is here under consideration provides for (continued…)

conditions and argues that the statutory damages cap places just such a condition and restriction on her right to a jury trial, making the right practically unavailable to her. But, this is simply not so. The damages cap does not present a condition or restriction on appellant's right to have a jury hear her case; rather, the burden lies in the limited amount of recovery allowed, and that is obviously not the same thing. Successful plaintiffs are often limited in their ability to recover the full amount of a jury's award for many different reasons – a defendant may simply be judgment-proof, for example – but this practical reality has nothing to do with the plaintiff's right to seek to have the merits of her cause determined by a jury, rather than some other **process**. This Court has struck down onerous procedural barriers to the exercise of the jury trial right, but that is quite a different matter from a substantive limit on the damages ultimately recovered – following a full-blown jury trial. See, e.g., Mattos v. Thompson, 421 A.2d 190 (Pa. 1980) (statutory arbitration scheme first upheld in Parker later determined to cause lengthy delays which present onerous conditions and restrictions which impose oppressive burden on that right).

The decision in Mishoe v. Erie Ins. Co., 824 A.2d 1153 (Pa. 2003) is instructive. There, the Court held that there is no constitutional right to a jury trial in cases involving bad faith claims against insurers under 42 Pa.C.S. § 8371, because there was no bad faith contract claim against insurers recognized at common law at the time Article 1,

---

(…continued)
compensation to the arbitrators in the sum of $25 each, or a total of $75, and the necessity of paying that amount as a condition for the right to appeal would seemingly operate as a strong deterrent, amounting practically to a denial of that right, if the case should involve only, as in the present instance, as little as $250. Therefore this rule, as well as the rules adopted or to be adopted by the courts of common pleas of other counties, should take cognizance of this fact and should provide for a lower rate of compensation where only a comparatively small claim is involved." 112 A.2d at 630.

Section 6 was adopted. In so holding, the Mishoe Court noted that the purpose of the constitutional provision "was not to contract the power to furnish modes of civil procedure in courts of justice, but to secure the right of trial by jury in its accustomed form before rights of person or property shall be finally decided." Id. at 1160 (quoting Haines v. Levin, 51 Pa. 412, 414 (Pa. 1866)). The Court explained that, under Article 1, Section 6, "the right of trial as it then existed was secured, and the trial itself protected from innovations which might destroy its utility and its security as a palladium of the liberties of the citizen. But beyond this point there is no limitation upon legislative power in constructing modes of redress for civil wrongs, and regulating their provisions." 824 A.2d at 1160. See also Van Swartow v. Commonwealth, 24 Pa. 131, 1854 WL 6430 *3 (1854) (statute creating summary offense for sale of spirits on Sabbath not unconstitutional for failing to provide jury trial; Legislature may create new offenses not triable by jury in 1790 and prescribe non-jury disposition). The Mishoe Court further noted that, even where juries render a verdict on damages, courts still maintain "judicial control over such awards by way of remittitur." Id. at 1159. See also Germantown Sav. Bank v. City of Philadelphia, 512 A.2d 756, 760 n.5 (Pa. Cmwlth. 1986), aff'd per curiam, 535 A.2d 1052 (Pa. 1988) (Section 8553(d) of Act, which provides for reduction of damages verdict by amount received from insurance proceeds, does not violate constitutional right to jury trial).

Even if it is assumed that the right to a jury trial in negligence cases filed against governmental entities existed in the "heretofore" described in Article I, Section 6, such that it must "remain inviolate" now, the full-blown jury trial appellant demanded and received was not impeded by the damages cap. What was affected was the ultimate recovery post-verdict, which was not a function of the trial here being by jury. As stated, that effect of the cap exists in all such cases – whether resolved by judgment motion, jury

trial, bench trial, or negotiated settlement – but the cap did not alter the availability, or contours of, a jury trial, any more than a jury trial against a judgment-proof defendant could be said to impair the jury trial **right**. Appellant has not met her burden of establishing that the Act's damages cap clearly, palpably and plainly violates Article I, Section 6.

## V. Conclusion

Pennsylvania courts have struggled with the difficult questions raised in this appeal – and the attendant policy implications – since the very beginnings of our common law system. The facts here are tragic, involving a school student who suffered grievous injuries caused by the uncontested negligence of the school district's employee. But, the circumstances are not unprecedented, and the lower courts did not err in relying on our prior cases to uphold the legislation at issue, as against the present constitutional challenges. Moreover, the conclusion that the General Assembly is in the better position than this Court to address the complicated public policy questions raised by the larger controversy has substantial force. Accordingly, we uphold the limitation on damages recoverable under Section 8553(b) of the Act, and therefore affirm the order of the Commonwealth Court.

Order affirmed. Jurisdiction relinquished.

Former Justice McCaffery did not participate in the decision of this case.

Messrs. Justice Saylor, Eakin and Baer, Madame Justice Todd and Mr. Justice Stevens join the opinion.

Mr. Justice Baer files a concurring opinion in which Madame Justice Todd and Mr. Justice Stevens join.